UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

A. KEVIN FAHEY, *on behalf of himself and the General Public of the District of Columbia*,

　　Plaintiff,

　　v.

GODIVA CHOCOLATIER, INC.,

　　Defendant.

Civil Action No. 19-2128 (JDB)

## MEMORANDUM OPINION

Plaintiff A. Kevin Fahey sued Godiva Chocolatier, Inc. in D.C. Superior Court under the District of Columbia's Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3904–28-3913. Godiva removed the action to this Court, and Fahey now moves to remand the action back to D.C. Superior Court. For the reasons set forth below, the Court concludes that it lacks subject matter jurisdiction over this dispute and therefore will grant Fahey's motion and remand the action to D.C. Superior Court.

### BACKGROUND

On June 19, 2019, Fahey purchased a package of five milk chocolate caramel candy bars through Godiva's website. Am. Compl. & Demand for Jury Trial ("Am. Compl.") [ECF No. 1-1] ¶ 18 & Figs. 1–10. The candy bars were shipped to Fahey in Washington, D.C. See id. Figs. 1–2. Each candy bar in the shipment bore the phrase "Belgium 1926" on its wrapper. See id. Fig. 10.

On May 25, 2019, Fahey sued Godiva in D.C. Superior Court, alleging that Godiva's inclusion of "Belgium 1926" on its wrappers violated the CPPA. Mem. of Law in Supp. of Mot.

1

to Remand to Dist. of Colum. Superior Ct. ("Pl.'s Mem.") [ECF No. 9-1] at 2; see also D.C. Code § 28-3905(k) (2001). In essence, Fahey alleges that the use of the phrase "Belgium 1926" on the labels for the candy bars he purchased, as well as on the labels of various other Godiva products, constitutes "a massive fraud on [U.S.] consumers by falsely implying the Products were made in Belgium." Am. Compl. ¶ 37. Because Belgium maintains "an international reputation for superior chocolate," Fahey contends, the phrase induces American consumers to pay a premium price for Godiva chocolate despite its being made, for the most part, in the United States. See id. ¶¶ 24–37.

As made clear in his subsequent amended complaint, Fahey brought the case on behalf of himself and "the DC general public who purchased Godiva chocolate products." Id. ¶ 1. For relief, Fahey seeks "statutory or actual damages, trebled, on behalf of [himself], except that in no case does [he] seek an amount in excess of $74,000; attorneys' fees; and an injunction against Defendant's violations of the CPPA; and any other relief this court deems just and proper." Id. at 25–26.

On July 17, 2019, Godiva removed the case to federal court under 28 U.S.C. § 1441, arguing that this Court has original jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). Notice of Removal [ECF No. 1] at 1. According to Godiva, the parties have complete diversity, and the amount in controversy easily exceeds the statutory requirement of $75,000 exclusive of interest and costs because, in addition to attorney's fees and statutory or actual damages, Fahey's proposed injunctive relief will cost at least $10 million. Id. ¶ 10.

Godiva subsequently filed a motion to dismiss, transfer, or stay the proceeding, see Def. Godiva Chocolatier, Inc.'s Mot. to Dismiss, Transfer, or Stay [ECF No. 8] at 1, and Fahey now moves to remand the case to D.C. Superior Court, see Mot. to Remand to Dist. of Colum. Superior Ct. ("Remand Mot.") [ECF No. 9] at 1. The Court stayed briefing on Godiva's motion to dismiss,

transfer, or stay until it reached a decision on Fahey's motion to remand, which is now fully briefed and ready for resolution. Order, Fahey v. Godiva Chocolatier, Inc., Civ. Action No. 18-2128 (D.D.C. Aug. 8, 2019).

### LEGAL STANDARD

Federal courts are courts of limited subject matter jurisdiction. An action originally filed in state court "may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending," only if the case falls within the federal court's original jurisdiction. 28 U.S.C. § 1441(a). Federal courts strictly construe the scope of their removal jurisdiction, and the party seeking to remain in federal court bears the burden of establishing that federal jurisdiction exists. Pesticides v. Dr Pepper Snapple Grp., Inc., 322 F. Supp. 3d 119, 121 (D.D.C. 2018) (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 107–08 (1941)).

"[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 87 (2014). But under 28 U.S.C. § 1446(c)(2)(B), if the plaintiff does challenge the defendant's allegation, then the district court is to determine by a preponderance of the evidence whether the amount in controversy exceeds the statutory requirement. See Owens, 574 U.S. at 88. "When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from state court, the district court must remand the case . . . resolv[ing] any ambiguities concerning the propriety of removal in favor of remand." Zuckman v. Monster Beverage Corp., 958 F. Supp. 2d 293, 297 (D.D.C. 2013) (internal quotation marks and citations omitted).

3

ANALYSIS

Federal district courts have jurisdiction in diversity cases when the amount in controversy exceeds $75,000 and the lawsuit is between citizens of different U.S. states or between U.S. citizens and foreign citizens or states. 28 U.S.C. § 1332(a). Here, both parties agree that there is complete diversity of citizenship—Fahey is a resident of Virginia, and Godiva is incorporated in New Jersey and has its principal place of business in New York. Am. Compl. ¶¶ 11–12; see also Def. Godiva Chocolatier, Inc.'s Opp'n to Pl.'s Mot. to Remand ("Def.'s Opp'n") [ECF No. 21] at 2. The main dispute is thus whether the amount in controversy exceeds $75,000.

Godiva argues that removal is proper because "the anticipated damages, costs, and fees" in this case exceed $75,000. Def.'s Opp'n at 3. Godiva bases this contention on several expenses that it contends will result from a ruling in Fahey's favor: (1) the cost of conforming to Fahey's requested injunctive relief; (2) the actual or statutory damages; and (3) attorney's fees. Id. at 13–19. The company submits an affidavit of Jennifer J. Smith, an executive in charge of regulatory affairs and quality control, explaining its projection for the costs of conforming to Fahey's proposed injunction. See generally Decl. of Jennifer J. Smith in Supp. of Godiva Chocolatier, Inc.'s Opp'n to Pl.'s Mot. to Remand ("Smith Decl.") [ECF No. 21-1]. The Court will consider each expense in turn.

**A. Costs of Proposed Injunctive Relief**

Godiva states "that the total costs directly arising from an injunction [as sought by Fahey] amount[] to $▮ million." Def.'s Opp'n at 8; see also Smith Decl. ¶ 17. According to Smith, the lion's share of this expense would consist of lost sales of approximately $▮ million during the six months it would take to comply fully with the injunction. Smith Decl. ¶ 14–15. Smith notes that, "[i]f Godiva was compelled to modify the content or design of its label, such a

4

modification would affect all of its products nationwide." Id. ¶ 9. Godiva contends that it cannot use different labels in Washington, D.C. than in the rest of the country because "third party retail merchants cannot market the same product with two different labels," "using different labels in different parts of the country would potentially confuse consumers," and different labels would require different "stock keeping unit" numbers, leading to duplicative packaging and inventory. Id. Smith states that "Godiva would spend at least six months creating a new label that complied with the terms of the injunction": three months for "redesign and remanufacture [of] a compliant label followed by another three months to fully replace the inventory." Id. ¶ 13.

The remaining costs associated with Fahey's proposed injunctive relief come from disposal of previously mislabeled stock and the adjustment of Godiva's labeling process. Smith declares that an injunction would "require Godiva to destroy or throw away all of its unused inventory bearing the Offending Label," valued at around $27.3 million, and all unused offending packaging, valued at $3.4 million. Id. ¶ 11. Additionally, retooling the label printer and designing new packaging would cost about $100,000. Id. ¶ 12.

Fahey challenges Godiva's total injunction cost of $███ million in two ways. First, he argues that the proper perspective for viewing the costs of an injunction—as well as the other expenses that factor into the amount in controversy—is not the total cost to the defendant, but the cost divided by the number of plaintiffs who benefit. See Reply to Def. Chocolatier's Inc.'s Opp'n to Pl.'s Mot to Remand ("Pl.'s Reply") [ECF No. 22] at 4–5; Pl.'s Mem. at 4–5. Second, Fahey insists that there is no need for the company to destroy its product and forgo six months' worth of sales, because there is "no public interest in forcing the defendant to destroy existing inventory." Pl.'s Reply at 6. He also notes that any requested injunction in this case "would be accompanied by a proposal that [Godiva] be able to sell its existing inventory," perhaps in combination with a

5

"national announcement . . . to the public that the old inventory was defectively labeled and in fact made in the United States." Id. at 6–8.

The Court largely agrees with Fahey on both points. "When calculating the amount in controversy under 28 U.S.C. § 1332, it is well-established that 'the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement.'" Breathe DC v. Santa Fe Nat. Tobacco Co., 232 F. Supp. 3d 163, 167 (D.D.C. 2017) (quoting Snyder v. Harris, 394 U.S. 332, 335 (1969)). This so-called non-aggregation principle "applies when separate and distinct claims are asserted on behalf of a number of individuals, regardless of whether an action involves a simple joinder of multiple plaintiffs, or a representative action." Breakman v. AOL LLC, 545 F. Supp. 2d 96, 103 (D.D.C. 2008) (internal quotation marks and brackets omitted). Courts in this Circuit have consistently applied this principle when a plaintiff seeks injunctive relief under the CPPA on behalf of the public. See, e.g., Animal Legal Defense Fund v. Hormel Foods Corp., 249 F. Supp. 3d 53, 60 (D.D.C. 2017) ("[T]he cost of compliance that a court should consider when determining the amount in controversy is the total amount divided among the beneficiaries of the injunction."); Breathe DC, 232 F. Supp. 3d at 170–72 (calculating the amount in controversy by dividing the total costs "reasonably attributed to the injunction . . . by the number of beneficiaries"). Following the weight of these cases, the Court adopts the non-aggregation principle in evaluating whether Godiva has demonstrated an amount in controversy exceeding $75,000.

The question for the Court thus becomes twofold: What is the total cost of the injunction to Godiva, and how many consumers will benefit from such an injunction? Despite Godiva's representations through Smith, the Court has significant "doubts" about both the presented costs of an injunction and the number of beneficiaries of such an injunction and, therefore, "the existence

6

of subject matter jurisdiction." Cf. Pesticides, 322 F. Supp. 3d at 121.

In terms of costs, the Court finds Godiva's proposed costs speculative and unreasonable. First, although Smith describes the $▮ million loss in sales as "tied directly to the costs of Godiva's compliance with any injunction," Smith Decl. ¶ 15, Godiva fails to satisfy its burden in establishing the reasonableness of that figure. Over the past three years, Godiva has made $▮ million, $▮ million, and $▮ million, respectively, during the six months from October to March. Id. Smith posits that, "based on the sales that Godiva's current business initiatives [are] expected to generate and [this] sales information for the past three calendar years," the expected lost sales are $▮ million. Id. But sales of $▮ million again, let alone $▮ million, are not assured, particularly if the six months excluded such holidays as Christmas and Valentine's Day that are captured by Godiva's chosen period. Indeed, anything more than the $▮ million is "too speculative to serve as the basis for determining the amount in controversy." Zuckman, 958 F. Supp. 2d at 302.

Second, it is not clear that Godiva would have to cease all its sales in light of an injunction. Godiva argues that, if it "was compelled to modify the content or design of its label, such a modification would affect all of its products nationwide." Smith Decl. ¶ 9 (emphasis added). But, as Mr. Fahey notes, "the product at issue is not inherently defective, but simply requir[es] additional disclosure." Pl.'s Reply at 6. Relief in fraudulent advertisement cases does not always require recall or cessation of production. See, e.g., Abbot Labs. v. Mead Johnson & Co., 971 F.2d 6, 17 (7th Cir. 1992) (highlighting "corrective advertisements and brochures" as one possible remedy for a false advertising and trade dress infringement violation); Thomas Nelson, Inc. v. Cherish Books, Ltd., 595 F. Supp. 989, 992 (S.D.N.Y. 1984) (ordering that the losing party in a trademark lawsuit pay for a corrective advertisement). It also remains to be seen why Godiva

7

would have to cease sales nationwide and not just in the District, the area of the proposed injunction. While Godiva might still have to wait six months to cycle through its inventory and have uniform, CPPA-compliant products, see Smith Decl. ¶¶ 13–16, Godiva does not explain why its sales could not continue across the rest of the country, particularly through its brick-and-mortar stores and third-party vendors in other states.

Third, it may be that neither a temporary cessation in sales nor the destruction of current inventory is necessary, because Fahey suggests in his brief that "any injunction would be accompanied by a proposal that [Godiva] be able to sell its existing inventory." Pl.'s Reply at 8. Such a carve-out in the injunction could avoid a significant percentage of the $▇ million in lost sales as well as the losses of $27.3 million in unused inventory and $3.4 million in unused packaging. See Smith Decl. ¶¶ 11, 15.

The Court also has considerable doubts about the number of consumers in Washington, D.C., who would be benefitted by such an injunction. Smith reports that Godiva sold its products to "approximately ▇ customers with addresses within the District of Columbia." Id. ¶ 8. That figure represents "▇ unique individual customers" who purchased products through Godiva's website and "28 unique third-party merchants located within the District of Columbia." Id. Under the CPPA, however, "consumer" is defined as "a person who, other than for purposes of resale, does or would purchase . . . consumer goods or services . . . or does or would otherwise provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2)(A). Godiva's ▇ online customers fit this description, but the twenty-eight third-party merchants do not because they buy chocolate from Godiva "for purposes of resale." Id. These merchants purchased "approximately 10,811 units," Smith Decl. ¶ 8, and although there is potential for repeat brick-and-mortar customers, as well as overlap between online and in-person customers, it is implausible that all

8

10,811 units went to just twenty-eight unique consumers.

Taken together, these questions about the cost of Fahey's proposed injunction and the number of beneficiaries thereof raise serious doubts about whether the amount in controversy exceeds $75,000. Under Godiva's approach, $█ million, when divided among █ total consumers, yields a per-consumer cost of about $105,894.07. But if just █ of the 10,811 units sold through third-party beneficiaries went to unique consumers, then the cost of the injunction per benefitted consumer drops to under $58,000.[1] Likewise, even if Fahey's statement that Godiva "be able to sell its existing inventory" were limited to just the current three-month stock, see id. ¶ 10, and sales still fell by half (i.e., $█ million), the cost of the injunction per benefitted consumer would drop to under $60,000.

Taking into account both the lower costs and the greater number of benefitting consumers that the Court deems more appropriate than the figures in Smith's declaration, Godiva has failed to prove the requisite amount in controversy by a preponderance of the evidence. And given that "any doubts about the existence of subject matter jurisdiction will be resolved in favor of remand," Hood v. F. Hoffman-La Roche, Ltd., 639 F. Supp. 2d 25, 28 (D.D.C. 2009) (citing Gasch v. Hartford Accident & Indem. Co., 491 F.3d 278, 281–82 (5th Cir. 2007)), the Court cannot rely solely on Godiva's alleged costs of complying with Fahey's proposed injunction to assure itself of subject matter jurisdiction under 28 U.S.C. § 1332(a).

### B. Actual and Statutory Damages

The next expense that Godiva flags, though does not discuss in significant depth, is the actual or statutory damages to be awarded in this case. Def.'s Opp'n at 17–18. Under the CPPA, a consumer may recover "treble damages, or $1,500 per violation, whichever is greater, payable

---

[1] That is, $█ million divided by █ consumers (█ online customers and █ brick-and-mortar customers).

9

to the consumer." D.C. Code § 28-3905(k)(1)(A). Fahey alleges that he purchased a five-piece set of candy bars, each of which had the allegedly inaccurate label. Am. Compl. ¶ 18 & Figs. 1–10. Although the cost of those candy bars is not evident from the face of his amended complaint, it seems likely that the statutory damages of $7,500—one violation for each individually wrapped candy bar—far exceed his trebled actual damages. Godiva provides no further information about any other individual consumer who purchased more items than Fahey, cf. Pesticides, 322 F. Supp. 3d at 121, thus the Court relies on the facts it does know about Mr. Fahey for this alleged expense.[2]

### C. Attorney's Fees

Lastly, Godiva argues that the attorney's fees provided for under the CPPA, when combined with the cost of Fahey's proposed injunction and statutory damages, "have the additive effect of putting this case far in excess of the jurisdictional threshold." Def.'s Opp'n at 18. Godiva posits that, based on Fahey's counsel's years of experience and the adjusted rate for the 2018–2019 year, the hourly rate under the Laffey Matrix (the fee schedule used by District of Columbia courts when calculating attorney's fees) would be $613 per hour. Id. Fahey does not appear to challenge this hourly rate, but insists that, like the cost of injunctive relief, attorney's fees cannot be aggregated to satisfy the amount-in-controversy requirement. See Pl.'s Reply at 9 (citing Breakman, 545 F. Supp. 2d at 107 ("[T]he non-aggregation principle logically should extend to claims of attorneys' fees.")).

The CPPA entitles prevailing consumers to "[r]easonable attorney's fees," D.C. Code § 28-3905(k)(2)(B), but Godiva does not provide any information about how many hours would be "reasonable" for Fahey's attorney to bill in this case, see Def.'s Opp'n at 18. Even if Fahey's

---

[2] The third-party sellers described in Smith's declaration do not appear to be eligible for statutory damages under the statute, for they are not "consumers" under the CPPA and are therefore not properly situated to bring an action. See D.C. Code §§ 28-3901(2), 28-3904(k)(1)(A); see also Ford v. Chartone, Inc., 908 A.2d 72, 83 (D.C. 2006) ("[T]he CPPA does not protect merchants in their commercial dealings with suppliers or other merchants.").

10

attorney spends 2,500 hours working on this project—well above the hours associated with other CPPA cases, see, e.g., In re InPhonic, Inc., 674 F. Supp. 2d 273, 283 (D.D.C. 2009) (awarding fees for a maximum of 1279.9 hours)—the total cost of legal fees that results ($1,532,500) must still be divided by the number of the members of the public benefited by this case. See Animal Legal Defense Fund, 249 F. Supp. 3d at 60. Using Godiva's figure of ▓▓▓ customers, which likely undercounts the consumers involved, as discussed above, the per-consumer attorney's fees would come out to just $▓▓▓.

\* \* \*

In sum, then, the Court is unpersuaded by Godiva's arguments against remand in this case. Fahey's statutory damages and attorney's fees together equal less than $10,000 at best, meaning that the cost of the injunction per benefitted consumer must exceed $65,000 for the Court to have jurisdiction. Given the considerable uncertainty around both the cost of the injunction and the number of consumers that would benefit in the District, the Court cannot assure itself that the injunction will cost that much. Taken together, Godiva's arguments for keeping this lawsuit in federal court do not show by a preponderance of the evidence that more than $75,000 is implicated for any potential District consumer. Too many doubts remain, and thus remand is the proper course. See Hood, 639 F. Supp. 2d at 28.

Finally, Godiva argues that this Court should avoid addressing the question of subject matter jurisdiction and instead evaluate Godiva's outstanding motion to transfer. Def.'s Opp'n at 9. Godiva notes that there is another action currently pending in the Southern District of New York that "share[s] an identical theory of liability and substantially similar allegations, claims, and demands for relief," id. at 10, and urges the Court to transfer this action there.

The Supreme Court has observed "that a court may, for the sake of efficiency, decline to determine its subject matter jurisdiction prior to deciding a 'threshold, nonmerits issue' presented

by a case." Hulley Enters. Ltd. v. Russian Fed'n, 211 F. Supp. 3d 269, 279 (D.D.C. 2016) (quoting Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 433 (2007)). Sinochem involved a motion for dismissal based on forum non conveniens, 549 U.S. at 429, and courts in this Circuit have also applied the same principle to motions to transfer under 28 U.S.C. § 1404(a), see, e.g., Aftab v. Gonzalez, 597 F. Supp. 2d 76, 79 (D.D.C. 2009). But the Supreme Court did not say that a district court <u>must</u> exercise this option; "[a] federal district court has <u>discretion</u> to dismiss a case" on such a threshold issue. Sinochem, 549 U.S. at 429 (emphasis added). The Court observes that it seems particularly inappropriate to transfer to a federal district court in New York a case brought under D.C. law in D.C. local court when significant questions exist as to federal jurisdiction. The Court chooses not to exercise its discretion to transfer the case under § 1404(a) and instead considers Fahey's motion to remand now, rather than transferring this case only to have its jurisdiction evaluated by yet another court.

## CONCLUSION

For the foregoing reasons, Fahey's motion to remand is granted, and the case will be remanded to D.C. Superior Court. A separate order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: February 12, 2020

12